Morning, and may it please the Court, my name is Steve Spires, on behalf of the Appellant, Mr. Damien Wilson. The District Court reversibly erred at every stage of the proceedings. First, the Court erred in denying Mr. Wilson's motion to suppress. It's indisputable that carrying a concealed firearm with a permit is a lawful activity in Louisiana, but according to the District Court and the government, doing so is presumptively unlawful and therefore automatically justifies a tarry stop. That argument is contrary to Louisiana state law, which provides for shall-issue concealed permits. If somebody meets basic requirements, they're entitled to a permit. That argument relies exclusively on out-of-circuit cases that have been heavily criticized for being inconsistent with the Fourth Amendment case law from the Supreme Court, and that argument puts the Fourth and the Second Amendment in conflict. Now, Louisiana state law is clear, and the Louisiana Supreme Court has confirmed this. Carrying a concealed firearm, it's lawful with a permit, unlawful without a permit. It's like driving. It's lawful with a license, it's unlawful without a license. It's simple. And importantly, as I mentioned, Louisiana is a shall-issue state, so it's not like the issue permit regimes that the Supreme Court overturned in the Bruin case. Now, the government attempts to bolster its argument that concealed carry is presumptively unlawful by citing the notification section of the— But that's not all that the—this was a marshal, is that correct? The detaining officer was a marshal? Yes. That's not all that he was aware of, right? I mean, there was other information that he acted upon upon seeing Mr. Wilson. I would disagree, Judge. The government focuses a lot on what it calls the surrounding circumstances to justify— He wasn't a complete stranger, is what I'm saying, is your client was not a complete stranger to Marshal Atkins, I guess is his name here. Correct. Correct. So Deputy Atkins was looking for another individual, Malik Fernandez, and he had developed information that my client, Mr. Wilson, knew Mr. Fernandez. So the marshals went to Mr. Wilson's apartment to do a knock and talk, to ask him questions about Mr. Fernandez. As they're sitting outside his apartment, Mr. Wilson walks out. He walks down the stairs. I think he lived on the third floor. And as he walked toward them, Deputy Atkins testified pretty clearly they saw the bulge in his pants, which they thought was a firearm. They immediately ordered him to stop and put up his hands. And the district court found that that fact alone, reasonable suspicion of carrying a concealed firearm, that that justified a Terry stop. But that's wrong under the Supreme Court's case law, because Terry and its progeny says that officers need a reasonable suspicion of criminal activity. And carrying a firearm with a permit is lawful in Louisiana. Simply carrying a gun by itself doesn't provide a reasonable suspicion. So really what the government's argument boils down to is that simply engaging in a licensed activity is reasonable suspicion. And we know that's wrong because of the Delaware v. Proust case. In that case, the state of Delaware said, we want to be able to pull people over to check if they have driver's licenses. Driving is dangerous. What about harboring a fugitive? Wouldn't that be a criminal activity that he had reasonably, maybe, afoot? It might be, but I don't think here—well, two things, Judge. Here I don't think the facts support reasonable suspicion that Mr. Wilson was harboring a  Deputy Atkins testified that he had developed information that Mr. Wilson was friends with Mr. Fernandez and maybe knew where he was. He had no reasonable suspicion that Mr. Wilson was harboring him. Even though they were like brothers. Sure. But that by itself, there's no reasonable suspicion by association. The fact that a family member or a friend of mine is a fugitive or committed a crime without more doesn't mean that there's reasonable suspicion to think that I'm harboring him or committing a crime myself. Didn't they say, we think he's living with Mr. Wilson? Didn't the family, when Atkins first goes out and he's advised that not only are they close, like brothers, if you find one, you can find the other, and that he's staying at the apartment or condominium of Mr. Wilson? I'm not sure about— I guess we can—I'm trying to put a finer point on what the record reflects here of their relationship insofar as what Marshall Atkins knew about your client at the time he encounters him. I think you're right. The case law is pretty clear on carrying a firearm, but I think you're distilling this down into the perfect world where Mr. Wilson's a stranger carrying a firearm and is detained because he's got a bulge in his pants that looks like he's carrying a firearm. But I'm not quite sure that's the case here, and I think the facts, as we get into more detail, seem to be a little more complicated. I would disagree, Judge. I think Deputy Atkins testified that he was looking for Malik Fernandez. He developed information that the last known address of Mr. Fernandez was Mr. Wilson's old family home, but then he said when he went there, neither person lived there anymore, so they're not living together anymore. He did tell the court at the suppression hearing that it was his belief that if he found one, he would find the other, but they go to Mr. Wilson's apartment, they're sitting outside, and here comes Mr. Wilson by himself. Mr. Fernandez wasn't there. So I think at that point, any belief that Mr. Wilson was harboring Mr. Fernandez, it's just a hunch. There aren't specific and articulable facts to support that. So it really does boil down, the government spends a lot of time in its brief focusing on Mr. Fernandez. He was involved in a shootout, he was a fugitive, but Mr. Wilson isn't alleged to have been a part to any of that. Mr. Wilson, he simply knows Mr. Fernandez, and I would submit that regardless of how close their relationship is, without more, that doesn't provide reasonable suspicion of a crime. Indeed, Deputy Atkins testified, they were just going to do a knock and talk. They didn't think Malik Fernandez was there, they were just going to talk to Mr. Wilson, hey, we're looking for this guy, do you know where he is? If the officer should not said stop, put your hands up, and just said, hey, are you carrying a weapon, there's no Terry stop, right? Yes, that would have been, if it was really a consensual encounter, that would not be the case. He's walking down the steps, sees him, says, hey, do you have a weapon? Because he sees the bulge, right? And so he says, hey, do you happen to have a weapon? And he says, I do. And then the officer says, do you have a permit? And he says, I don't. Then the case is different, right? Yes, Judge. I think at that point, Deputy Atkins would have had probable cause that he was unlawfully carrying. I'm sorry, go ahead. I didn't mean to. But that's just not what happened here. Yeah, exactly. So that means that the whole case, sort of in the entirety of the Terry stop hinges, I mean, this looks different than normal Terry stops, right? Because sometimes it's very clear that the officer is stopping you, detaining you, frisking you. None of that's going on here, except for the words stop, put your hands up. That's the entirety of the sort of fruit of the poisonous tree starts and ends with those two things, right? Because everything else that comes, the backpack, the warrant, everything else, your views, all of that falls because of those two sentences? I think so, Judge. At the moment, here comes Mr. Wilson, by all accounts, didn't even know the marshals were there. They ordered him, stop, put your hands up. To his credit, he immediately complies. At that moment, he's seized. And from there, the search of his person, the search of his backpack, all of that flows from that initial stop. And there was no reasonable suspicion to support that. Including the questions. The questions. Including the questions. You have a go. The entire interaction all flows from that unlawful stop. With the bit of my remaining time, I'd like to turn to the evidentiary error. So under any standard of review, the district court reversibly erred in admitting the improper lay witness opinion testimony by Deputy Atkins. Rule 701 of the Rules of Evidence, this court's case law, make it clear that lay witness testimony is only admissible if it's helpful to the jury. Under this court's case law, that means the witness needs to be better situated than the jury to provide an opinion on the matter. So testimony is not helpful, by contrast, if the jury is fully capable of determining the issue for itself. In that case, the witness would just be telling the jury what conclusion to reach. So under this court's case law, ID testimony, identification testimony, is only helpful if the witness has some prior familiarity with the defendant's appearance such that they're better situated. So here there was no foundation for the lay witness ID testimony. Deputy Atkins was not better situated than the jury to compare photographs, was not better situated than the jury to look at a photograph and to look at Mr. Wilson in court and make an ID. And that error certainly was not harmless. Deputy Atkins was the only witness who testified irrelevant to count six. You know, the government says that Mr. Wilson and Mr. Fernandez were close, but they brought forward no other witnesses to prove that. So the entire case really hinged on Deputy Atkins' testimony. And this court has recognized that this type of error, where improper opinion testimony is admitted, is especially concerning when a law enforcement official is involved because the jury might be swayed by the agent's aura of expertise and authority or might believe that the agent has some additional information. And that's especially true here because then at closing arguments, the prosecutor improperly bolstered that testimony, clearly and obviously so. The marshals know their job. They know who they're looking for. They know the identification. They completely bolstered that. So each of these errors, admitting the testimony in the first place or bolstering the inadmissible testimony, each error is reversible error independently, but together, one just amplified the other. The final issue I'd like to briefly touch on is the sentencing plane error. So the PSR clearly and obviously picked the wrong guideline. False statement offenses under 18 U.S.C. 1001, they can, the guidelines can be calculated based on two different guidelines depending on what type of offense. And the district court, the PSR and the district court clearly picked the wrong guideline 2J1.2. The government even agrees in their brief on page 47 that 2B1.1 is the correct guideline. It's clear and obvious from the text of the guidelines. This court's case law has recognized that there's two different applicable guidelines to these offenses based on the underlying facts. And as we explained in our brief that we clear all four prongs of plane error because this increases guidelines range. Now the government has come back in their response and hypothesized that the district court could have applied a 2B1.1 cross-reference, but that's not what the district court did. The government has to spend five pages talking about the hypothetical road not taken. So this is really an error that the district court, the government is claiming the district court made. The government is saying the district court erred in not applying the cross-reference. They did not raise that error below so it's forfeited. As we explained in the brief, in any event, it would have been an error to apply the cross-reference because there weren't the requisite factual findings and the record doesn't support it. The government says that Mr. Wilson's false statement offense is more like an obstruction offense. But as this court's case law makes clear, there's different knowledge and mens rea and specific intent requirements for those two offenses. And the government, as the proponent of an enhancement, has not proven that Mr. Wilson's offenses would fall within the obstruction offenses. So finally, briefly, I'd like to circle back to the Second Amendment here. But this case can be decided under clear Fourth Amendment case law, decades of this court's precedent. But I do think it's important that this court keep the Second Amendment implications in mind because the district court and the government's position, if accepted, would really mean that anybody who is exercising their Second Amendment rights in a manner permitted by state law would nonetheless be subject to a Terry stop. It would put the Fourth Amendment and the Sixth Amendment in conflict. The Fourth Circuit, the Sixth Circuit, the Tenth Circuit have recognized this, that allowing stops based on gun possession would basically mean that people exercising their Second Amendment rights sacrifice their Fourth Amendment rights in doing so. And that's not how the Bill of Rights works. And the government spends a lot of time in their brief trying to tell this court it doesn't need to reach this question. They say, well, there's other facts. But as we discussed earlier, a lot of those facts don't make it more likely that Mr. Wilson was committing a crime. They make a great case that Mr. Fernandez was a criminal. What about the fact that when the police go to the apartment complex, they talk to witnesses who say they see Fernandez going there all the time, quote, all the time? I mean, I appreciate very much listening to the federal public defender exhorting the virtues of the Second Amendment. I think it's great. And I appreciate the reminder. And I'm with you when it comes to things like, hey, there's a stranger walking around. I think he has a gun. We know nothing else about this person. We don't know his name. We don't know anything else. We just get an anonymous tip, like some of these cases say, and the police do a Terry stop of that person. It makes perfect sense what you're saying. But this isn't that. There's so much other stuff, including the fact that they had reason to believe. Now, maybe they were wrong, but they had reason to believe that Fernandez was there then or was there often or was there all the time and that these guys were brothers. It just seems very different than the anonymous tip case in some of these circuit cases. I would say even if they did believe that Mr. Fernandez had been at the apartment recently, it's still a speculative leap to say that Mr. Wilson was harboring a fugitive. We don't know anything about what Mr. Wilson knew. We don't know if he even knew an arrest warrant was out for Mr. Fernandez. Deputy Atkins never even told him that. So I think that still is too speculative. That still would put too many people at risk of suspicionless stops merely because they're related to or friends with somebody who's a criminal. I just think there needs to be more. This is too speculative. It's too much of a hunch. And the marshal's own actions, I think, play that out. They didn't approach this as if they thought Mr. Fernandez was there. They just wanted to do a knock and talk. They said, let's just go knock on the door and talk to him. If they really thought, as the government says, that a dangerous armed fugitive, Mr. Fernandez, involved in a shootout was in the apartment, I think they would have responded differently. So I just think there might be another case with stronger facts where there would be suspicion that the person was harboring a fugitive. But here it's just too thin. It's just they were associated with each other. They knew each other. That's just not enough. If the Court has no other questions, I'll reserve my time for rebuttal. Thank you, counsel. May it please the Court. I'm Megan Roberts with the United States of America. First of all, I want to say, this is the case. These are those facts. Damon Wilson was not a target. He was not a random person walking down the street. Instead, he was sought to help the U.S. Marshals find an armed and dangerous fugitive. Yet Wilson obstructed justice every step of the way. This case stems from U.S. Marshals seeking federal fugitive Malik Fernandez, who is wanted for his role in an 80-bullet shootout inside the Canal Street Hotel in December of 2020. At this point, it's March 2022, and he is still wanted. The investigation into Fernandez's whereabout is what led U.S. Marshals to find Damon Wilson. Even before encountering Wilson, U.S. Marshals had been told that the two men were like brothers. Where you find one, you're going to find the other. In fact, Fernandez's last known address was at Wilson's family home in Chalmette. And from that, he learned, Deputy Atkins learned where he could find Damian Wilson. So he did a background check on Damian Wilson. He learned that a few months earlier, Damian Wilson had been arrested with a loaded firearm and also possession of drugs. Knowing that, he went to Damian Wilson's apartment complex. And he did ask around at the apartment complex before he ran into Wilson. And in the suppression hearing record on page 426, he's asked, did you ask anyone if they recognized Malik Fernandez? And he responded, I did, yes. They did tell me that Damian Wilson lives in apartment 323. I showed them a photo of my target, Malik Fernandez. And they also agreed that they had seen him around inside apartment 323 and in and around the apartment, and when asked about the time frame, they said they saw him there often. But they said within the last week, they had definitely seen him there. So with all of this information, he decides to do a knock and talk. But before just walking up there to the apartment, he actually called in backup. And as they're waiting for backup to arrive, he sees Damian Wilson exiting the apartment. I mean, at this point, he's already talked to the neighbors. He's already talked to the employees of the apartment complex. He knows they don't take this chance. More than likely, Damian Wilson is going to find out that people are asking about him and Malik Fernandez. So they wait for him to come down from the apartment stairwell, and immediately law enforcement see a very large bulge in his waistband. And in fact, it turned out to be a Glock 45 with an extended magazine. So this was not a tiny little handgun hidden. They saw the bulge in his waistband, and they knew immediately what it was. So combined with all of these facts, I realize what counsel is trying to say as far as a mere gun possession. That's not this case. Well, what is your answer about it? I mean, you're from the United States, so hypothetically, this is an active circuit split. Take the case where we really just have suspicion of gun possession in a shallow, sheer state. What is the position of the United States? Is that reasonable cause for a Terry stop? I'm sorry, reasonable suspicion for a Terry stop? Well, I'll answer that in a couple ways. First of all, we disagree that it is a circuit split, because if you actually look at the circuits, they're actually looking at state law. A perfect example of that is the Ninth Circuit. The Ninth Circuit, they issued an opinion in United States v. Vaughn Tomp, it's a California case, and they have come out and said that a Terry stop was allowed if you saw a bulge in a waistband. There was a Washington State case, though, that came out a year before that where they said no, because it's presumptively lawful in Washington State to have a concealed carry. So that, at that point, they said there wasn't enough information. And what I think's really interesting about that case in Washington State, where I feel like it can be illustrative here, I'll get to it. I just, I'm happy to give you as much latitude as we can, but I'd like to talk about Louisiana. And so, whenever you're comfortable, if we can get to a shallow issue state where the license is an affirmative defense. What is the position of the United States? Can you just stop a random New Orleanian on the street, knowing nothing else except that someone told you that he had a gun, can you stop him? Well, the law changed in July of 2024. Before that, it was presumptively unlawful. Our law very much looked what United States v. Lewis in Florida looked like. The law has since changed where now you don't need a permit. But at that time, yes, law, it even actually came up in trial testimony. Deputy Atkins was asked, did you know if he had a concealed weapon, what did you know? I knew at that point it was against the law. Can you stop a random New Orleanian just driving down the street and say, I would like to see your driver's license? It's presumptively unlawful to drive in New Orleans without a driver's license. Can you just stop somebody driving down the street and say, do you have a license? I mean, I think you would need more than that. So what is the difference between the two things? It's easier to get a, prior to 2024, it's easier to get a concealed permit than it is to get a driver's license. I think the difference comes back to why we have Terry stops in the Fourth Amendment. It goes down to officer safety. Guns are scary. Well, no, but I think that they are more dangerous in situations like this. You think a gun is more dangerous than a car? I'm not saying that, no. But I'm saying in situations like this, you have a situation where you have to, the whole reason behind Terry stops is, first of all, law enforcement safety. I'm shocked to hear the United States say that. Because the point of the Terry stop is you have reasonable suspicion that a crime either was committed or is being committed. I very much am grateful for our law enforcement personnel, and I do agree with you that law enforcement safety is really, really important. But Terry is not a case that says whatever we do for officer safety is okay, and interactions with people on the street, we can make sure that they're not armed just to have a talk with them. Although I do want to, I mean, I understand your concerns there. But the law at the time, and especially during this with Wilson, it was presumptively unlawful. And also, if you look at sort of the Louisiana statutes at the time, if you are a law abiding and you have concealed carry, one of the things in there says they have a duty to inform a law enforcement officer that they have a weapon on their person and they can submit to a pat down or allowed to be temporarily disarmed. That was built into the state law. In addition to law enforcement may take temporary possession of the firearm if the officer has reasonable grounds to believe the person is under the influence of alcohol or a controlled dangerous substance, so there were things built into the law. So if you are a person walking down the street, in theory you would have a duty to tell that police officer, I have a concealed carry on me. When you say, again in the old, back in the permit regime. When you say it's presumptively unlawful under state law, is that because the permit is an affirmative to defense? Is that why you're using the phrase presumptively unlawful? Correct. That is what a lot of the other circuits have sort of called this, presumptively unlawful, because asking if you have a permit is an affirmative to defense.  And so your view, the fourth amendment reasonableness of the Terry Stop hinges on whether the state law phrases the permit as an affirmative defense. No, but I'm saying the reasonable suspicion definitely plays into that because it goes to an officer's knowledge. And I think part of that knowledge is also state law. And if you were trying to articulate to me the officer's reasonable suspicion, and again, I realize we're talking about a hypothetical, but it's an important one. And it's one that our court hasn't answered yet, and so I want to make sure I understand the government's position. Officer gets a phone call, or a 911 tip, my gosh, there's this scary looking man in my neighborhood, I think he has a gun. And the officer goes up to the so-called scary looking man, and Terry stops him. The officer's reasonable suspicion is what? I guess my question for you would be, are you asking- Actually, I get to ask the questions, so. Well, I'm just trying to clarify, is that the law that was in place when Wilson was stopped, or is that the Louisiana law as it currently is? Well, we can do either one, but let's do the first one when Wilson was stopped. So let's just do a shall issue state where the permit is an affirmative defense to the general prohibition on permitless carry. And the officer gets a phone call, and the reason I don't think this matters is because the phone call doesn't say anything about permits. The phone call says, my gosh, scary man, and my gosh, I think he has a gun. And so the officer stops him on the street, and his reasonable suspicion for the Terry stop is? I mean, I think one would probably agree that that tip was not reliable, so I think there would be- So what, so now that, I thought you told me earlier that you could stop for officer safety. Under the law, before it changed in July of 2024, if an officer were to see a concealed weapon, and they used their knowledge and experience to believe that that was a concealed weapon, under the law at that time, they could go and do a Terry stop. Do a brief stop to find out if the person had a permit. But they couldn't do it for driving? That was a question. I don't have a response to that. Okay, I'm going to move on to address the layperson testimony, and then also quickly the sentencing issue. So with the layperson testimony, I just kind of want to back up and just sort of give the factual circumstances around that. And that is, Deputy Atkins, after asking Wilson about Fernandez's whereabouts, they had a conversation where Deputy Atkins reached the conclusion that Wilson had been lying to him. He exits the vehicle, and he learns that Wilson has an Instagram handle on his hat, and then pulls up these two photos on Wilson's public Instagram page. And at that point, it confirms to him that Wilson has been lying about having seen Fernandez. He had said repeatedly to Deputy Atkins that he hadn't seen Fernandez in six years. And here he has- This is the conviction on for giving a false statement, is what you're talking, is that what you're talking about? Correct, yes. We're talking about 18 U.S.C. 1001. And I'm interested to hear. And so the evidence in support of that conviction was that there was something on social media? Well, the evidence was that he, when Deputy Atkins was doing his investigation about Fernandez, he had learned that Wilson and Fernandez were close, and he knew that Fernandez had been around the apartment complex. The false statement was him saying that he hadn't seen him. That he hadn't seen him for six years. So you got some proof that he had. Correct. That he had seen him. So I'm asking you what the proof was. The proof was those Instagram photos. That was the proof. Social media. Social media, correct. And the Instagram photo showed- Showed the two men together. It was dated November 27th, 2021, so it was four months earlier, and it showed the two men in Atlanta together. And so Wilson- It was dated November 7th, 2021. The post was dated. The pictures, the photos were not, because the way Instagram dates things, it's when you make the post. It's not necessarily when you actually post the picture. And that came out- So you don't know when the photo was taken? That's- Deputy Atkins testified he didn't know when the photo was taken. However, the false statement that supported the conviction was that Wilson kept saying he hadn't seen Fernandez in six years. The men were 21. And if he hadn't seen Fernandez in six years, that would have been when he was 15 years old. This was within the jury's ability to sort of assess the evidence, weigh the credibility findings, and look at the pictures, Instagram photos, and say, is this a photo of two men that are 21, or is this a photo of two men that are 15? So he said repeatedly, I haven't seen him in six years. He didn't say, I don't know where he's at. He said, I haven't seen him in six years. And he said it over and over and over again. And then five days after having that conversation with Deputy Atkins, they're stopped in Mississippi. They're actually in a high-speed chase with Wilson driving, and Fernandez bails out of the car. And a portion of that was stipulated at trial. More of it was stipulated at sentencing. So the jury was able to hear all of that, the stipulation that- This was after he made the statement that I hadn't seen him in six years, when they got, they were in the car. Yes, yes, that was after. So the only evidence that he was lying about not having seen him in six years was that photo. That photo, and also Deputy Atkins' investigation into looking for Fernandez. And that he had spoken to family members and everyone else. Just the circumstantial evidence that these men knew each other and had been together and knew each other for quite a long time. So it wasn't that they hadn't seen him like six years ago. It's, you know, Fernandez- So his false statement was he hadn't seen him in six years. Correct, yes. And the only evidence to negate that is a photo on Instagram, right? I mean, that's it. In addition to- Whatever other people may have said. I'm assuming all these other people weren't called in to testify to say, I saw him looking at him. So I know he saw him. I saw him with him. They didn't testify. No, just Deputy Atkins' investigation.  Yes. And then finally, moving on to the sentencing. So, Wilson obstructed justice trying to cover for a friend. When Deputy Atkins arrived to speak to him, he said, I'm with the police. I'm just here for Malik Fernandez. I just want to talk to you about where he's at. And the whole time, Wilson just kept saying, I don't know, it's been six years. And no one objected to the cross-reference to 2J1.2 at the time of sentencing, in part because the record does support that his false statement was an obstruction of justice. 18 U.S.C. 1001, the applicable guideline is 2B1.1. However, commentary of the guideline says, sometimes offenses involving fraudulent statements are prosecuted under 18 U.S.C. 1001 or a similarly general statute, although the offense involves fraudulent conduct that is also covered by a more specific statute. And so here, looking at his conduct, the fact that he was basically endeavoring with a very specific intent to impede a court officer in the discharge of his duty, and that is Deputy Atkins, he was on the fugitive apprehension team. He went looking for Fernandez, and Wilson kept telling him each and every time, no, haven't seen him, don't know where he is. And then finally, when Deputy Atkins said, I know you're lying to me, it's against the law to lie to a federal agent, Wilson said, do what you gotta do. All of these factors is what the sentencing court could take into consideration. The trial testimony and also the stipulation in sentencing to say that his conduct fell more under 18 U.S.C. 1503. And that is, you can do the Croft reference to J1.2 with that offense conduct. All right. Any other questions? All right. Thank you so much. Rebuttal. Thank you. Just a couple points on the Fourth Amendment issue. I think it's important to reorient ourselves here. What is the crime? The question here is, was there reasonable suspicion to believe that Mr. Wilson didn't have a concealed carry permit? This stop wasn't about harboring a fugitive. There was no reasonable suspicion that Mr. Wilson was doing so. And if the officers did have reasonable suspicion that he was harboring a fugitive, whether he was armed or not would have arguably been irrelevant. He was stopped because of the gun. And whether Mr. Fernandez was present or not, whether Mr. Wilson knew him, none of that makes it more likely that Mr. Wilson didn't have a permit. The crime is carrying a concealed firearm without a permit. And all of the facts about Mr. Fernandez, any relationship Mr. Wilson had with him, none of those make it more likely that Mr. Wilson didn't have a permit. Second on the Fourth Amendment issue, there is a circuit split here. Judge Oldham, you brought this up. This affirmative defense, presumptively unlawful kind of rationale, there is a circuit split. And as we described in the briefing, the cases like Lewis and Pope that the district court and the government rely on are inconsistent with the Supreme Court's analysis in cases like Gates and Harris, where the Supreme Court's told us we don't look to things like the burden of proof at trial to decide the Fourth Amendment question. So there is a circuit split here. Third, the notice law that the government relies heavily on. That law says if you're approached and stopped, then you have to notify. The government reads that law as if it provides authority for the stop. It doesn't. It tells the permit holder what their obligation is once they are consensually approached or lawfully stopped. That's not what happened here. The police simply ordered Mr. Wilson to stop as soon as they saw him. He had no chance to notify. He had no, and they did that without any knowledge, without any reasonable suspicion that he was committing a crime. And the final point on the Fourth Amendment issue, nothing in our argument, and we discussed this earlier on in my opening, nothing in our argument prevents the police from consensually approaching somebody and asking questions. Nobody prevents the police from arresting somebody if they develop probable cause the person's breaking the law. But that's just not what happened here. And that is, it doesn't infringe on the Fourth Amendment to approach and ask questions. It does infringe to immediately direct somebody to stop and put their hands up. That's a seizure at that moment that he submitted to their authority. And then briefly on the sentencing issue, just to clarify, I thought I heard the government say that the district court applied a cross-reference. The district court didn't apply a cross-reference. The district court simply applied the 2J1.2 guideline. The district court did not apply the 2B1.1 cross-reference. The PSR didn't apply that cross-reference. There were no factual findings made to support that cross-reference. And I would submit, for the reasons I discussed earlier about the different mens reas and intent requirements of the obstruction statutes versus the false statement statutes, I would submit that the record as it currently stands does not support that. It would have been plain error on this record without factual findings to apply the cross-reference. And for that reason, regardless of what this court decides on any other issue, at a minimum, you must vacate and remand for resentencing. And the government can try to make their case on remand for the obstruction enhancement, but they haven't proven it here. The court has no more questions. I will sit down. Thank you. Thank you, Counsel. The court will take this matter under advisement. That concludes today's docket. We are adjourned.